J-A06001-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| SCOTT SHEPARD | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AGNIESZKA SHEPARD | : | No. 907 WDA 2025 |

Appeal from the Order Entered July 3, 2025
In the Court of Common Pleas of Allegheny County Family Court at
No(s): FD24-007698-009

BEFORE: OLSON, J., MURRAY, J., and BECK, J.

MEMORANDUM BY OLSON, J.: **FILED: May 13, 2026**

Appellant, Scott Shepard, ("Father") appeals from the July 3, 2025 final custody order entered in the Court of Common Pleas of Allegheny County that granted Father and Agnieszka Shepard ("Mother") shared legal and physical custody of the parties' biological children, L.O.S., a female child born July 2014, and L.A.S., a male child born October 2017, (collectively, "the Children") in accordance with the parameters set forth therein.[1] As part of

_____

[1] On July 3, 2025, the trial court entered a final custody order that granted Mother and Father shared legal and physical custody of the Children. **See** Pa.R.Civ.P. 108(b) (stating that, "[t]he date of entry of [a civil] order in a matter subject to the Pennsylvania Rules of Civil Procedure shall be the date on which the clerk makes the notation in the docket that written notice of entry of the order has been given as required by [Pennsylvania Rule of Civil Procedure] 236(b)"). The trial court docket reveals that notice of the final custody order was provided to the parties, pursuant to Rule 236(b), on July 3, 2025. **See generally**, Trial Court Docket at 7/1/25 Entry.

the July 3, 2025 final custody order, the trial court also denied Father's request

to relocate the Children to Ann Arbor, Michigan. After careful review, we affirm

the July 3, 2025 final custody order.

The trial court summarized the factual and procedural history as follows:

Father is [a 41-year-old] self-employed real estate broker, who lives in Ann Arbor, Michigan with the Children when they are in his [physical] custody. [Mother] is [a 44-year-old] college professor, who resides in Mt. Lebanon[,] Pennsylvania with the Children when they are in her [physical] custody.

Mother and Father met in Boston, Massachusetts while working at the same coffee shop. They married on February 16, 2004, in Detroit, Michigan and continued to live in Michigan through the birth of their Children. Mother's and Father's first [c]hild arrived

_____

On July 9, 2025, Father filed a motion for reconsideration of the final custody order. On July 15, 2025, Mother filed a petition that sought to hold Father in contempt of, and to enforce, the final custody order. On July 18, 2025, the trial court entered two orders that disposed of the matters. The first order denied Father's motion for reconsideration of the final custody order. The second order granted Mother's petition for contempt and modified the final custody order to address the parameters of the shared physical custody of the Children for a certain time period in August 2025. On July 25, 2025, Father filed a timely notice of appeal.

This Court has long-held that, "a custody order will be considered final and appealable only if it is both: 1) entered after the [trial] court has completed its hearings on the merits; and 2) intended by the [trial] court to constitute a complete resolution of the custody claims pending between the parties." *G.B. v. M.M.B.*, 670 A.2d 714, 720 (Pa. Super. 1996). Here, the trial court entered the July 3, 2025 final custody order upon conclusion of the custody hearing and intended that order to resolve completely all of the then-outstanding custody claims between the parties. As such, Father's appeal properly lies from the July 3, 2025 final custody order that was made final by the July 18, 2025 order that denied Father's motion for reconsideration. The second July 18, 2025 order that modified a certain aspect of the July 3, 2025 final custody order was an ancillary order entered by the trial court to implement the final custody order and was not a final, appealable order.

- 2 -

in July [] 2014. Their second [c]hild arrived three years later in October 2017. Both Children were born in Wayne County, Michigan, where the parties had lived for thirteen years. However, approximately two months after [L.A.S.'s] birth, Mother and Father relocated to Kathleen[,] Georgia where Mother accepted a [teaching position] with [a local] university. Mother and Father deliberated and agreed upon this move. This was the first academic tenure offered to Mother[. It] was viewed as an intentional path [for] Mother [to] expand[] and strengthen[] her career[,] which was good for their family. [The family] continued to live in Georgia for almost six years, until August [] 2023, when Mother's employment with [the university] ended[. At this time] the family relocated to [] Pennsylvania when [a local university] hired Mother as a professor in the School of Business. Mother and Father describe different reasons or events leading up to the change in Mother's employment, but both acknowledge and admit that [the] decision to [relocate] to [Pennsylvania] was one they both settled on prior to the move.

Mother[,] Father[,] and the Children lived in the Mt. Lebanon School District [] before [Mother and Father separated] in the Spring [] 2024. Neither Mother nor Father provided a specific reason for [the] separation but[,] by all accounts, the parties' marriage had many problems. Mother and Father are very different in their communication, relationship, and parenting styles[.] Father's work required that he spend significant time away from the family[. T]he family budgeted on a limited income[,] and Mother and Father lived much of their relationship in conflict or in distrust of each other. Father filed a complaint in divorce on April 1, 2024, which contained a claim for shared physical and legal custody [of the Children]. The [trial] court scheduled the case for an interim relief hearing and custody conciliation before the chief custody hearing officer on June 4, 2024. At that time, Mother and Father reached an interim agreement to share legal custody and physical custody of the Children on a week-on/week-off schedule and agreed to continue the interim relief hearing to July 25, 2024. Just prior to reaching this agreement, Mother and Father also filed cross-temporary protection from abuse ("PFA") petitions[. The trial] court denied any protective relief but granted both Mother and Father a "hearing date only." Both Mother and Father ultimately withdrew the PFA petitions by consent on June 4, 2024.

When Mother and Father appeared for the interim relief hearing on July 25, 2024, Father was not clear with the [trial] court

whether he continued to live in Washington County, Pennsylvania or had relocated to Michigan. As such, Mother and Father consented to an interim court order that continued the shared legal and physical custody arrangement but contained alternative conditions based on Father's actual [place of] residence. If Father [] relocated to Michigan, the Children would have custody periods with him three weekends per month with the exchange to occur [half-way] between Father's residence in Michigan and Mother's residence in [Pennsylvania]. The [trial] court preserved the claims for custody and scheduled the matter for a judicial conciliation.

Father filed a notice of proposed relocation the very next day[, July 26, 2024,] and Mother filed a counter-affidavit on July 29, 2024. The [trial] court scheduled the case for an expedited judicial conciliation to address relocation on September 25, 2024. At the judicial conciliation, Mother and Father could not reach final settlement[,] and the case moved forward with a pre-trial conference on December 6, 2024[. A] one [-]day custody trial [was held] on December 13, 2024[,] to address Father's complaint for shared physical and legal custody[,] filed on April 1, 2024, Father's notice of proposed relocation[,] filed on July 26, 2024[,] and Mother's counter-affidavit regarding relocation[,] filed on July 29, 2024. Unfortunately, the [trial] court and the parties were unable to complete the trial in one day[,] and the [trial] court scheduled a second day of trial for January 8, 2025. []

Over the course of the two[-]day trial, Mother and Father testified[,] in addition to [an individual who worked as] the Children's *au pair* while [the family] living in Georgia. Following this, the [trial] court also heard from both Children in an on-the[-]record interview [on March 17, 2025].

Trial Court Opinion, 9/9/25, at 2-6 (extraneous capitalization omitted).[2] At the conclusion of the March 17, 2025 hearing, the trial court closed the record.

On July 3, 2025, the trial court, in a final custody order, denied Father's request to relocate the Children to Michigan. Final Custody Order, 7/3/25, at

_____

[2] For ease of reference, we have assigned page numbers to the trial court's unpaginated opinion.

1. The trial court ordered that Mother and Father share legal and physical custody of the Children in accordance with the parameters and custody schedule set forth in the final custody order. *Id.* at 1-4.

On July 9, 2025, Father filed a motion for reconsideration, which the trial court denied on July 18, 2025. This appeal followed.[3]

Father raises the following issues for our review:

[1.] Did the trial court abuse its discretion in its application of and findings regarding the 23 Pa.C.S.A. § 5337 relocation factors which are manifestly unreasonable considering the evidence presented?

[2.] Did the trial court abuse its discretion in its application of the 23 Pa.C.S.A. § 5328 custody factors which are manifestly unreasonable considering the evidence presented?

[3.] Did the trial court err as a matter of law under [Pennsylvania Rule of Civil Procedure] 1915.4(c) and (d) when it failed to promptly adjudicate on a custody matter, without an order showing good cause?

Father's Brief at 2-3.[4]

Father's first two issues challenge the trial court's order that denied his petition to relocate the Children and to modify the physical custody arrangements regarding the Children based upon Father's relocation to

_____

[3] Father and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

[4] For ease of disposition, we have reorganized Father's issues.

Michigan. Our scope and standard of review of such custody determinations is well-settled.

> In reviewing a custody order, our scope is of the broadest type and our standard is abuse of discretion. We must accept findings of the trial court that are supported by competent evidence of record, as our role does not include making independent factual determinations. In addition, with regard to issues of credibility and weight of the evidence, we must defer to the [trial court which] viewed and assessed the witnesses first-hand. However, we are not bound by the trial court's deductions or inferences from its factual findings. Ultimately, the test is whether the trial court's conclusions are unreasonable as shown by the evidence of record. We may reject the conclusions of the trial court only if they involve an error of law, or are unreasonable in light of the sustainable findings of the trial court.

*E.C.S. v. M.C.S.*, 256 A.3d 449, 457 (Pa. Super. 2021), *quoting* *S.T. v. R.W.*, 192 A.3d 1155, 1160 (Pa. Super. 2018).

> With any child custody case, this Court has long stated that the paramount concern is the best interests of the child. This standard requires a case-by-case assessment of all of the factors that may legitimately affect the "physical, intellectual, moral and spiritual well-being" of the child. When a custody dispute involves a request by a party to relocate, we have explained, there is no black[-]letter formula that easily resolves relocation disputes; rather, custody disputes are delicate issues that must be handled on a case-by-case basis.

*C.M.K. v. K.E.M.*, 45 A.3d 417, 421 (Pa. Super. 2012) (citations and some quotation marks omitted). "[W]hen a proposed relocation necessarily involves the modification of the parties' custody [arrangement, trial] courts must consider [the factors under Section 5328(a), as well as the factors under Section 5337(h), of the Child Custody Act.]" *E.C.S.*, 256 A.3d at 453, *relying on* *A.V. v. S.T.*, 87 A.3d 818, 824-825 (Pa. Super. 2014) and *D.K. v. S.P.K.*,

- 6 -

102 A.3d 467, 176-477 (Pa. Super. 2014); *see also* 23 Pa.C.S.A. § 5328(a); 23 Pa.C.S.A. § 5337(h).

Section 5328(a) of the Child Custody Act states that

In ordering any form of custody, the [trial] court shall determine the best interest of the child by considering all relevant factors, giving substantial weighted consideration to the factors specified under paragraphs (1), (2), (2.1) and (2.2) which affect the safety of the child, including the following:

(1) Which party is more likely to ensure the safety of the child.

(2) The present and past abuse committed by a party or member of the party's household, which may include past or current protection from abuse or sexual violence protection orders where there has been a finding of abuse.

(2.1) The information set forth in section 5329.1(a) (relating to consideration of child abuse and involvement with protective services).

(2.2) Violent or assaultive behavior committed by a party.

(2.3) Which party is more likely to encourage and permit frequent and continuing contact between the child and another party if contact is consistent with the safety needs of the child.

(3) The parental duties performed by each party on behalf of the child.

(4) The need for stability and continuity in the child's education, family life and community life, except if changes are necessary to protect the safety of the child or a party.

(5) The availability of extended family.

(6) The child's sibling relationships.

(7) The well-reasoned preference of the child, based on the child's developmental stage, maturity and judgment.

(8) The attempts of a party to turn the child against the other party, except in cases of abuse where reasonable

safety measures are necessary to protect the safety of the child. A party's reasonable concerns for the safety of the child and the party's reasonable efforts to protect the child shall not be considered attempts to turn the child against the other party. A child's deficient or negative relationship with a party shall not be presumed to be caused by the other party.

(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child adequate for the child's emotional needs.

(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational and special needs of the child.

(11) The proximity of the residences of the parties.

(12) Each party's availability to care for the child or ability to make appropriate child-care arrangements.

(13) The level of conflict between the parties and the willingness and ability of the parties to cooperate with one another. A party's effort to protect a child from abuse by another party is not evidence of unwillingness or inability to cooperate with that party.

(14) The history of drug or alcohol abuse of a party or member of a party's household.

(15) The mental and physical condition of a party or member of a party's household.

(16) Any other relevant factor.

23 Pa.C.S.A. § 5328(a)(1-16) (effective Aug. 13, 2024, to Aug. 29, 2025).[5]

Section 5328(a.2) states that

---

[5] In June 2025, Section 5328(a) of the Child Custody Act was amended with the amendments taking effect August 29, 2025. **See** 2025, June 30, P.L. 18, No. 11, § 1 (effective Aug. 29, 2025). The Section 5328(a) amendments included deletion of factors 5, 8 (recodified as factor 2.3(ii)), 9, 10

No single factor under [Section 5328(a)] shall by itself be determinative in the awarding of custody. The [trial] court shall examine the totality of the circumstances, giving weighted consideration to the factors that affect the safety of the child, when issuing a custody order that is in the best interest of the child.

23 Pa.C.S.A. § 5328(a.2) (effective Aug. 13, 2024).

Section 5337(h) of the Child Custody Act states that

In determining whether to grant a proposed relocation, the [trial] court shall consider the following factors, giving weighted consideration to those factors which affect the safety of the child:

(1) The nature, quality, extent of involvement and duration of the child's relationship with the party proposing to relocate and with the nonrelocating party, siblings and other significant persons in the child's life.

(2) The age, developmental stage, needs of the child and the likely impact the relocation will have on the child's physical, educational and emotional development, taking into consideration any special needs of the child.

(3) The feasibility of preserving the relationship between the nonrelocating party and the child through suitable custody arrangements, considering the logistics and financial circumstances of the parties.

---

(incorporated into newly-amended factor 3), and 13 (incorporated into newly-amended factor 2.3). The trial court, in evaluating whether, or not, to modify the custody order in the case *sub judice*, was required to consider the Section 5328(a) factors that were in effect at the time of the custody trial. *C.R.F. v. S.E.F.*, 45 A.3d 441, 445 (Pa. Super. 2012) (stating that, "if the evidentiary proceeding commences on or after the effective date of the [amendments to the Child Custody Act, the revised provisions] apply even if the request or petition for relief was filed prior to the effective date;" the commencement date of the evidentiary hearing determines whether the amendments are applicable).

(4) The child's preference, taking into consideration the age and maturity of the child.

(5) Whether there is an established pattern of conduct of either party to promote or thwart the relationship of the child and the other party.

(6) Whether the relocation will enhance the general quality of life for the party seeking the relocation, including, but not limited to, financial or emotional benefit or educational opportunity.

(7) Whether the relocation will enhance the general quality of life for the child, including, but not limited to, financial or emotional benefit or educational opportunity.

(8) The reasons and motivation of each party for seeking or opposing the relocation.

(9) The present and past abuse committed by a party or member of the party's household and whether there is a continued risk of harm to the child or an abused party.

(10) Any other factor affecting the best interest of the child.

23 Pa.C.S.A. § 5337(h).[6] "The party proposing the relocation has the burden of establishing that the relocation will serve the best interest of the child as shown under the factors set forth in [Section 5337(h), and each] party has the burden of establishing the integrity of that party's motives in either seeking the relocation or seeking to prevent the relocation." 23 Pa.C.S.A. § 5337(i) (formatting modified).

_____

[6] Although, Section 5337 was amended on October 27, 2025, with the amendments taking effect on November 26, 2025, the revisions to Section 5337 did not, however, include any amendments to Section 5337(h). **See** 2025, Oct, 27, P.L. 131, No. 40, § 1 (effective Nov. 26, 2025). The Section 5337(h) factors, which became effective on January 24, 2011, were in effect at the commencement of the custody hearing and remain applicable in the case *sub judice*. 23 Pa.C.S.A. § 5337(h); **see also C.R.F.**, 45 A.3d at 445

While Father, generally, challenges the trial court's consideration of the factors under Section 5328(a), he asserts, in particular, that the trial court abused its discretion in considering factors 5328(a)(1), (a)(3), (a)(5), (a)(7), (a)(9), (a)(10), and (a)(12). Father's Brief at 24. Father argues that he testified "extensively about his consistent involvement in [the Children's] medical, educational, and emotional needs" and raised concerns about the Children "being left alone while in Mother's physical custody." *Id.* at 24-25. Father contends that the Children "missed school days resulting in truancy notices while in Mother's physical custody" and he is concerned "regarding Mother's health issues and hospitalization, which sometimes left her unable to care for [the Children]." *Id.* at 25. Father argues that if both parents are fit, as the trial court found, then "reducing Father's time, especially given his demonstrated involvement and concerns about [the Children's] well-being, is detrimental and not in their best interests and manifestly unreasonable." *Id.* Father asserts that the record "supports the argument that maintaining or increasing Father's time better serves [the Children's] best interests." *Id.* at 25-26. Father argues that reducing his physical custody time "by three [] weekends each month or [108] overnight[ visits] per year to [81] overnight[ visits] per year as outlined in the July [3,] 2025 [final custody order] was manifestly unreasonable in light of the [r]ecord." *Id.* at 26 (footnote omitted).

Similarly, while Father, in general, challenges the trial court's order denying his relocation petition, he, in particular, asserts that the trial court erred in its consideration of the relocation factors enumerated in Section

- 11 -

5337(h)(3) and (7).[7] *Id.* at 16-22. Regarding the factor enumerated in Section 5337(h)(3), Father asserts that "the trial court does not craft a [physical custody] schedule that preserves [the Children's] relationship with both parties." *Id.* at 21. Father contends that his proposed plan for physical custody is "closer to" the current custody schedule whereby Father exercises physical custody of the Children "three [] weekends per month, including long weekends when school is closed on Monday," with "shared holiday time," and physical custody of the Children for the entire "summer with the exception of a two[-]week consecutive vacation period [with] Mother."[8] *Id.* Father argues

_____

[7] Although Father frames his issue, in part, as a challenge to the trial court's consideration of the factors enumerated in Section 5337(h)(6) and (h)(7), Father, ultimately, agrees that the trial court correctly determined that the relocation would enhance the quality of Father's life under Section 5337(h)(6). *See* Father's Brief at 19 (stating, "overall the trial court found that the relocation would enhance the general quality of life for Father"). As such, Father challenges the trial court's assessment of the Section 5337(h)(7) factor - whether relocation would enhance the lives of the Children. *Id.* (stating, "the trial court ignored the evidence presented when fashioning its finding regarding whether the relocation enhances the general quality of life for the [Children]").

[8] Father's proposed custody schedule, generally, called for Father having physical custody of the children during the weekdays while the Children attend school in Michigan and Mother having physical custody of the Children during the school year either one weekend per month, or during certain months, two non-consecutive weekends per month. Father's Pre-trial Statement, 12/3/24, at Proposed Custody and Relocation Order of Court, ¶B. During the summer months, when the Children are not attending school, Mother would have physical custody of the children "from the first Friday following [the Children's] last day of school through the first Friday of the last weekend before [the Children's] first day of school, except that Father would have physical custody of the Children for one week during the month of July." *Id.* Father's proposed

- 12 -

that "the result of denying relocation is a schedule [crafted by the trial court] that undermines shared custody, effectively creating a primary/secondary custodial dynamic." *Id.* at 22. Father contends that the "trial court's decision unintentionally favors geographic stability over parental parity, despite the stated goal of maintaining equal involvement." *Id.*

Concerning the factor enumerated in Section 5337(h)(7), Father contends that "the trial court ignore[d] the evidence presented when fashioning its finding regarding whether the relocation enhances the general quality of life for [the Children]." *Id.* at 19. In particular, Father asserts that the "trial court altogether ignored the truancy notices [issued by the Children's elementary school] in [Pennsylvania]" and "all of the evidence regarding educational stability and special needs and gifted support [a school in Michigan could offer the Children.]" *Id.* at 20. Father contends that the trial court "narrowed [the Section 5337(h)(7) factor] to only regarding the 'connection of [Father's] relatives and [the] community [in Michigan].'" *Id.*

The trial court provided a discussion, with regard to the custody and relocation factors specifically challenged by Father, as follows:[9]

## CUSTODY FACTORS

---

custody schedule also called for the exchange of the Children to occur "in Michigan at a public location mutually agreed to by the parties." *Id.*

[9] We reviewed, and incorporate herein, the trial court's analysis of the Section 5328(a) and 5337(h) factors in its entirety. We, however, set forth *supra* the analysis that pertains to the specific factors challenged by Father.

- 13 -

**(1) Which parent is more likely to ensure the safety of the [C]hildren.**

Father credibly testified that he provides a safe and loving home for the Children. Mother credibly testified that she also provides a safe and loving home for the Children. Father raised concerns that Mother allows the Children to be home alone, allows the Children to be on their electronics for excessively long periods of time, and that Mother does not provide a clean or habitable home environment. Mother raised concerns that Father does not address the Children's educational needs, including homework assignments, that Father obsesses over the Children, creating issues where there are none, and that Father restricts contact between Mother and the Children. While the [trial] court finds that these claims are intensified by the high amount of conflict and low level of trust between the parties, the credible testimony and evidence presented at trial did not support either parent's position that the Children were in an unsafe environment with either parent.

For the above reasons, this factor equally favors both Mother and Father.

. . .

**(3) The parental duties performed by each party on behalf of the [C]hildren.**

Mother testified that for the first year of [L.O.S.'s] life, Mother served as the primary care provider, in part because she breastfed [L.O.S.], but also because she organized the day-to-day care while Father worked. When [L.O.S.] turned one year old, she entered daycare as Father worked full[-]time, and Mother was in school full-time working toward her [doctorate in philosophy]. When the parties moved to Georgia, approximately three years later, Mother continued to work full[-]time [at a] university[,] and Father worked full[-]time for his real estate company in Michigan, often travelling one or two weeks a month back to Michigan for business. For portions of that time, the parties relied on an *au pair* to care for the Children and then eventually the Children attended daycare. Mother testified that she continued to breastfeed [L.A.S.] and provide much of the care for the Children, particularly when Father was travelling for work. Father's testimony confirmed that he did travel regularly for work and that the parties relied on both the *au pair* and the daycare, but Father contradicted Mother's testimony, instead stating that he was the

parent primarily responsible for caring for the Children while Mother was at work, taking them to the doctor, the dentist and addressing their educational needs. Father also put forth that Mother was unable to keep the home organized and habitable for the Children and Father was continuously doing housework and cleaning when he returned from his work travels. This was confirmed by [the *au pair*] who testified that Mother did not seem to have an interest in keeping a clean home and Father was responsible for these tasks.

Since the parties separated, Mother testified that she ensures the Children attend school, noting that they live about one-half [] mile from the elementary school in a walking district and she either drives them to school or they walk with their friends. The Children walk home from school or Mother picks them up, she feeds them an early dinner, they do homework when it is assigned to them after which they play games, build Legos, read, draw, and spend time with friends. The Children engage in activities including ice-skating, piano, and "girls on the run." Mother acknowledged that the Children do spend time on their electronics, playing educational games or entertainment games with friends. Both Children go to bed sometime between 8[:00] p.m. and 9[:00] p.m.

Father credibly testified that when the Children are in his custody, they enjoy their time together, they read, play games, spend time outside, they do activities in the community, they take weekend trips to a family cabin, and they spend time with family who live close by. Father credibly testified that he makes sure they are current on any homework assignments and takes a general interest in the important things happening in their lives.

The credible testimony and evidence presented at trial confirms that both Mother and Father are equally able to get the Children to school, doctor appointments and involved in community activities[,] as well as meet their day-to-day parenting needs.

This factor favors Mother and Father equally.

. . .

**(5) The availability of extended family.**

Mother does not have any extended family in [Pennsylvania]. Mother's family [resides] in Poland[,] and Mother

- 15 -

[testified] that the family visited Poland on several occasions in the past. Mother [testified] that despite not having extended family in [Pennsylvania], she and the Children do have a significant support system, noting that[,] when the family moved to [Pennsylvania,] Mother joined a parent[s'] group where she developed friendships, including with her now closest friend[.]

Father testified that paternal grandparents, paternal uncle and cousins live in Michigan. He also testified that there are many personal friends that live within ten to fifteen minutes from him. Father credibly testified that the Children have great relationships with these individuals and that Father and the Children depend on this ["]village["] for support and community.

This factor favors Mother and Father equally.

. . .

**(7) The well-reasoned preference of the [C]hildren, based on the child's developmental stage, maturity, and judgment.**

As part of the custody proceedings, [the trial] court interviewed both Children. Based on those interviews, the [trial] court did not find that [L.A.S.] had the level of development or maturity necessary to offer the [trial] court credible information about a preference related to custody in this matter. Based on those interviews, the [trial] court did find that [L.O.S.] was mature and capable of giving a well-developed foundation for her preference. However, [L.O.S.] was neutral in all respects. She enjoys spending time with both Mother and Father[. S]he feels safe with both Mother and Father[. S]he recognizes that Mother and Father do not get along well but does not feel that either parent keeps her from having a relationship with the other parent or that either parent is speaking badly to her about the other parent[. W]hile she expressed no desire to move to Michigan[,] it was only because she was equally content spending time with Mother and Father and did not rank one location over the other.

This factor favors Mother and Father equally.

. . .

**(9) Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the Children adequate for the Children's emotional needs.**

As stated throughout the other factors, both Mother and Father presented credible evidence that they provide a loving, stable, consistent and nurturing relationship with the Children that adequately meets the Children's emotional needs.

This factor favors Mother and Father equally.

**(10) Which party is more likely to attend to the daily physical, emotional, developmental, educational, and special needs of the [C]hildren.**

The evidence shows that both Mother and Father have been providing for the daily physical, emotional, educational needs of the Children when they lived as an intact family. However, this was often done in a parallel fashion[,] and Mother and Father were not often co-parenting. There was evidence presented at trial that Mother and Father are able to co-parent and share information about the Children when they are not in high conflict with each other, but this is rare. Regardless, when the Children are with Mother, she is capable to attend to their needs and when the Children are with Father, he is capable of attending to their needs.

This factor favors Mother and Father equally.

. . .

**(12) Each party's availability to care for the Children or ability to make appropriate child-care arrangements.**

The evidence and testimony show that Mother can care for the Children. Mother credibly testified that since Fall [] 2023, she has worked full time as a professor in the School of Business at [a Pittsburgh-based university], teaching two in-person classes and one online class each semester (although she can request to teach more). Her schedule is usually Monday[-]Wednesday[-]Friday in the first semester and Tuesday[-]Thursday in the second semester. Each day she begins after 9:00 a.m. and finishes before 3:00 p.m. She must also publish three papers before the end of 2028. Because of this schedule, Mother testified that during the school year, she is home when the Children are home from school and because the contract is a [nine-]month contract, she may elect not to teach in the summer. If Mother does teach in the summer, it is online courses only and it is asynchronous learning, so Mother is primarily responsible for posting assignments. It is Mother's goal to become tenured in this position. While Mother did testify that there may be limited

instances where she is not available to care for the Children after school, she does have plans in place that involve the assistance of neighbors.

The evidence and testimony also show that Father can care for the Children. Father credibly testified that his work is flexible and that he able to arrange his schedule to care for the Children. Presently, the Children are primarily in Father's custody during the weekends and Father is fully available to care for them. In addition, Father does have extended family members and friends, including paternal grandparents, that he can rely on to assist with childcare as needed. Father's testimony confirms that he is available to care for the Children and when he is unavailable, he has a clear support system in Michigan.

This factor favors both Mother and Father equally.

## RELOCATION FACTORS

**(3) The feasibility of preserving the relationship between the nonrelocating party and the [C]hildren through suitable custody arrangements, considering the logistics and financial circumstances of the parties.**

Father's proposed relocation arrangements are likely to adversely affect the Children's relationship with Mother. Mother has been an integral part of the Children's development. Father's proposed custody schedule would not permit Mother to be as present, engaged, and involved in the Children's physical, educational, and emotional development[] and[,] therefore[,] would not preserve the relationship that Mother has with the Children.

. . .

**(7) Whether the relocation will enhance the general quality of life for the [C]hildren, including, but not limited to, financial or emotional benefit or educational opportunity.**

Father testified about better educational opportunities for the Children in Michigan. Father also testified that the medical treatment providers in Michigan have a prior relationship with the Children, having been their pediatricians at the time of their births. Father testified that there are many family members in Michigan, including paternal grandparents, paternal uncle and several cousins[,] in addition to a community of friends and

neighbors who serve as a [""]village[""] of support for the Children. On the contrary. Father could not provide any evidence that the Children's current school or medical providers were not meeting or exceeding the Children's needs. Additionally, Mother credibly testified that the Children had similar relationships and support[] in [Pennsylvania] and would be harmed by losing them to a relocation. Finally, while the Children had a prior connection to the Michigan region, they had not lived there since 2017 when [L.O.S.] was 3 years old, and [L.A.S.] was 2 months old. Per the credible testimony of both parents, most of the time the Children had spent in Michigan with their relatives since 2017[,] (particularly paternal grandparents) was around the holidays or special celebrations, which was confirmed by the photographs entered by Father as Exhibit 18, which primarily contained past photographs of the Children and Father[']s family around the Christmas season. While Father may have started to reestablish the Children's connection to these relatives and this community in Michigan, the evidence and testimony at trial does not support the finding that a relocation to Michigan would generally enhance the Children's quality of life compared to their life in [Pennsylvania].

Trial Court Opinion, 7/3/25, at 5-11, 14, 16-17 (extraneous capitalization omitted).

In denying Father's request to relocate the Children to Michigan and crafting its final custody order, the trial court explained,

the application of the custody [and relocation] factors to the credible evidence and testimony presented at trial confirmed that (1) there was insufficient evidence to show that relocating the Children [to] Michigan would enhance the quality of their lives by comparison to their current circumstances, and (2) that the move would be detrimental to their development as well as their relationship with Mother. While the move to Michigan may improve Father's circumstances, the Children are doing well in [Pennsylvania]. Father has made little effort to engage in their lives in [Pennsylvania] since the parties separate[ed,] and he presented very little evidence to show why relocating [the Children] to Michigan would create positive change to their lives, especially when balanced against the negative impact it would have on their relationship with Mother and the benefits they receive from living in [Pennsylvania]. Simply because Father has

- 19 -

decided to live in Michigan and change the family's circumstances is not sufficient to grant a relocation in this case.

The credible evidence and testimony established in this case is that the Children are best served by two parents who commit the effort and work necessary to improve their communication, trust[,] and parenting interactions with each other, and who are equally present, engaged, and involved in the Children's physical, educational, and emotional development in the same space. Both Mother and Father presented credible testimony and evidence and almost every factor [] confirms that Mother and Father prioritize meeting the educational, developmental, emotional, social, and community needs of the Children. Individually, Mother and Father are meeting the daily parenting needs of the Children. Currently, it is a high level of conflict and mistrust between Mother and Father that restricts them from successfully and jointly meeting those needs. Mother and Father still have much work to do, work they have not done before, and the time has come to stop blaming each other, begin to understand their differences[,] and work to gain the skills and tools to co[-]parent. The [trial] court will be looking at their efforts in this work should either of them come back with a request for modification in the future. Arguably, if both parents resided in [Pennsylvania], this would be a case for equally shared physical custody where Mother and Father would need to focus all their efforts on co-parenting counseling. However, based on the analysis listed under the factors above, the [trial] court finds that the [final custody order] outlines a custody arrangement that is in the best interest of the Children with Mother living in [Pennsylvania] and Father living in Michigan.

*Id.* at 18-19 (extraneous capitalization omitted).

Upon review, we find record support for the reasonable conclusions reached by the trial court in its consideration of the relocation and custody factors set forth *supra*. Father testified that he is the owner of a property management company located in Michigan. N.T., 12/13/24, at 16. Prior to his relocation to Michigan, Father stated that his work required him to spend three days a week in Michigan with the remaining four days a week spent in

Pennsylvania, although he did not travel to Michigan every week. *Id.* Father explained that his relocating to Michigan permanently allowed him to earn "significantly more income" and that, if he remained living in Pennsylvania, he would need to give up his property management business and source of income. *Id.* at 19, 30-31. Father, in sum, described Mother's parenting as "not timely," meaning that Mother was often late for the exchange meetings, "not appropriate," not "healthy," and "just unacceptable." *Id.* at 88. Father spoke about Mother leaving the Children home alone and stated that she has "absolutely no support group" in Pennsylvania to assist her with child-care. *Id.* at 101. Father spoke of his network of family and friends in Michigan that are available to assist him with child-related care. *Id.* at 123-125. When asked to explain how the Children's lives would be impacted if the relocation were approved, Father stated,

> Their lives are going to be so much better [in Michigan]. We have no one in [Pennsylvania.] We don't have any birthday parties. We have no one we can invite to birthday parties. We don't have a community [in Pennsylvania.] Their lives are going to be much better [in Michigan]. They're going to have friends. They're going to have family. They're going to have support. They don't have to worry about whether or not they're going to [] be making it to school. I don't have to worry about whether or not they're going to be making it to the dentist appointment to fix a tooth. I don't have to worry about any of this stuff. My children are going to be around family, friends, and support.

*Id.* at 127. Father explained that the school system the Children would attend in Michigan has "a lot better of a support system for [the Children, including better support for L.A.S.'s autism disorder.]" *Id.* at 127. Father stated that

"[t]here is no significant beneficial assistance at the school that [L.A.S. is] currently at for autism[ and the school in Michigan] is a leader nationally in autism and inclusion." *Id.* at 128. Father further explained "[w]e have one of the largest autism centers in our neighborhood within walking distance." *Id.* Father also stated that, in Michigan, L.O.S. "can get back into the gifted program" similar to the one she was enrolled in while attending school in Georgia, and that her current school in Pennsylvania does not have a gifted program. *Id.* Father stated that his proposed custody schedule would allow the Children to spend the weekdays with him so that he could "make sure that they are able to attend school on a timely manner" and "spend time on their schooling and working on different social interactions[.]" *Id.* at 134. Father would also be able to limit "the amount of excessive screen time" the Children spent using their electronic devices. *Id.* Father's proposed custody schedule included time for the Children to spend with Mother during the school year, and the Children would spend "a majority of the time" with Mother during the summer months, when school was not in session. *Id.* at 135-137. Father explained that the relocation plan and proposed custody schedule would "encourage the time that [Mother] spends with [the Children] to be quality time." *Id.* at 143.

Mother testified that her work schedule is flexible and she is able to be home when the Children are home. N.T, 1/8/25, at 8-11. Mother stated that the Children were "doing great" academically at their current school and socially. *Id.* at 38. She described L.O.S. as having "a lot of friends" and

L.A.S. as having "a ton of friends." *Id.* Mother explained that the interim custody order set forth a custody schedule dependent upon Father's residency and that Father chose to reside in Michigan. *Id.* at 46. Mother also stated that she has "friends in [her] neighborhood" and that most of her friends are the parents of the Children's friends. *Id.* at 60. Mother explained that, as friends, they "help each other all of the time[.]" *Id.* Mother testified regarding the Children's friends, the activities to which the Children get invited, including birthday parties, and the extra-curricular activities the Children do, including soccer, ice-skating lessons, Taekwondo, and a running club. *Id.* at 64-87. Mother explained how she helps the Children in the morning get ready for school and that L.O.S. prefers to walk to school while Mother typically drives L.A.S. *Id.* at 105. Mother meets the Children after school, cooks them dinner, and they spend time, after dinner, playing games, reading books, and doing homework. *Id.* at 106-107. During the summer, Mother explained that she spends time with the Children, *inter alia*, going to museums, the zoo, or "discover[ing] Pittsburgh." *Id.* at 109-110. Mother stated that when the Children spend custody time with Father on the weekends, their homework is not completed. *Id.* at 111.

Finally, the trial court interviewed the Children. L.A.S. spoke about his friends at school and how he sometimes walks to school or Mother drives him. N.T., 3/17/25, at 8. L.A.S. stated that his Mother helps him sometimes with his homework, and sometimes he does it on his own, but that he "definitely [does not] do homework with [Father because he lives] in Michigan." *Id.* at

8-9. L.A.S. explained that Father is excited to see him when he visits and when he is not with Father, Father looks at pictures *via* his cellular telephone. *Id.* at 9. When asked how he wanted to spend his time with Mother and Father, L.A.S. responded, "I don't have a thought." *Id.* at 17.

L.O.S. stated that, at school, she is involved in the talent show, and she and her friends like to dance. *Id.* at 23. L.O.S. explained that she likes to walk to school with her friends. *Id.* at 27. She stated that she feels "safe" living with Mother or Father. *Id.* at 29-30. When she is staying with Mother, L.O.S. likes to watch television with Mother and to draw with her. *Id.* at 30. When she is with Father, L.O.S. likes to ride her bicycle and take walks. *Id.* at 31. When asked how she felt about spending part of her time in Pennsylvania and part of her time in Michigan, L.O.S. responded, "I think that it is fine. I don't mind it at all." *Id.* at 33.

The record supports the trial court's conclusion that there is a "high level of conflict and mistrust" between Mother and Father that, ultimately, prevents the parties from "successfully and jointly meeting the needs" of the Children. While Father proposes that the relocation of the Children to Michigan will enhance the Children's lives, he failed to meet his burden by establishing specifically what aspects of the Children's lives would be definitively enhanced by the relocation such that the Children's lives would be improved beyond the current lives the Children maintain in Pennsylvania. The Children's school in Pennsylvania and the proposed school in Michigan are highly ranked academically and offer the same level of opportunities for the Children,

including any special needs that may be identified for the Children. Father's assertion that relocation to Michigan would avail the Children of a "broader support network" ignores that Mother and the Children currently have a similar network of parents and friends in Pennsylvania. Finally, Father failed to meet his burden of establishing that his proposed physical custody arrangement would preserve the Children's relationship with Mother, as the non-relocating parent. Rather, Father's proposed physical custody arrangement, as detailed *supra*, would limit Mother's interaction with the Children during the school year, which represents approximately three-quarters of the calendar year, to either one or two weekends per month and would require Mother to make the custody exchange in Michigan instead of meeting Father at a location that is of equal travel for both parties.

As the trial court stated, and the record supports, Father made the conscious decision to relocate to Michigan, and this decision will, as Father explained, benefit Father's career and financial stability. Nonetheless, it is the best interests of the Children which control the outcome of any custody and relocation decision. Here, the trial court concluded, and the record supports, that the custody factors weighed equally between Mother and Father. The Children reside in a safe environment when in Pennsylvania with Mother, as well as when they are in Michigan with Father. Each parent performs their parental duties with regard to the Children while the Children are in each party's respective physical custody, including meeting the daily physical, emotional, developmental, educational, and special needs of the Children.

The Children did not express a preference for living with one parent over the other parent, nor did they express any specific desire for change in the custody arrangement that would require them to relocate to Michigan. Contrary to Father's characterization of the Children's lives in Pennsylvania, the Children maintain friendships with several children and classmates that would be diminished if the Children relocated to Michigan. Father's claims of trial court error simply ask this Court to reweigh the credibility of the witnesses and the evidence and reach a different conclusion with regard to his request for relocation and modification of the physical custody arrangements. We decline Father's invitation, as it within the purview of the trial court, which is intimately familiar with the parties and has observed the parties, to determine the credibility of the witnesses and the weight to be assigned to the evidence. We discern no error of law or abuse of discretion in the trial court's order that denied Father's request for relocation and set forth final custody arrangements.

In his final issue, Father asserts that the trial court erred as a matter of law by failing to issue its decision and final custody order in accord with Rule 1915.4.

Rule 1915.4 states, in pertinent part, as follows:

**Rule 1915.4. Prompt Disposition of Custody Cases**

. . .

**(c) Trial.** Trials before a [trial court] shall commence within 90 days of the date the scheduling order is entered. Trials and hearings shall be scheduled to be heard on consecutive days

whenever possible but, if not on consecutive days, then the trial or hearing shall be concluded not later than 45 days from commencement.

**(d) Prompt Decisions.** The [trial court's] decision shall be entered and filed within 15 days of the date upon which the trial is concluded unless, within that time, the [trial] court extends the date for such decision by order entered of record showing good cause for the extension. In no event shall an extension delay the entry of the [trial] court's decision more than 45 days after the conclusion of trial.

Pa.R.Civ.P. 1915.4(c) and (d).

Father asserts, and the record reveals, that the custody hearing commenced on December 13, 2024, with a second day of trial being held on January 8, 2025. The trial court subsequently interviewed the Children on March 17, 2025. The trial court did not announce its decision and enter the final custody order until July 3, 2025, which was beyond the 45-day period following the conclusion of the custody trial. The trial court did not enter an order extending the deadline for good cause. Father asserts that "the delay significantly prejudiced [him]" and "voluminous and adversarial litigation ensured regarding a summer schedule for the [Children that] would have been mitigated [if the trial court complied with Rule 1915.4]." Father's Brief at 14-15.

In its Rule 1925(a) opinion, the trial court explained that

The pre-trial scheduling order [was] dated September 25, 2024. By way of explanation, several trial dates are offered to counsel, however, often counsel[s'] schedule[s] and the [trial] court's availability [did] not align, and trials are set on the first available date when counsel and [the] parties [were] available. In this case, that occurred on December 13, 2025 ([78] days after the date the [trial] court originally entered the pre-trial scheduling

order). The second date of trial occurred on January 8, 2025, and the on-the record interview of the Children occurred on March 17, 2025. Again, while the [trial] court offered dates that fell within the deadline range established under Rule 1915.4(c), they were not dates that worked for the parties[ or] counsel[s'] schedules. . . . While the [trial] court recognizes its delay and the significance of the deadlines established under [Rule 1915.4], the ]trial] court does note in [its July 3, 2025] discussion that the [trial] court took additional time to address the factors based on the complexity of the case. Additionally, while the [trial] court further recognizes that [the] parties deserve a swift and prompt resolution of their custody claims, and that families deserve finality, the [trial] court believes that conducting a comprehensive and thorough review of the testimony and evidence under the factors is paramount to the best interest of the Children. Finally, in the instant case, Father had already relocated [to Michigan] with no stated intention to return to [Pennsylvania. The] parties were acting under an interim custody order that provided Father substantial custody periods with the Children in Michigan, and the delay of [the trial] court's [final custody] order, while creating a continuation of an unknown outcome for the Children and the parties, did not significantly prejudice them.

Trial Court Opinion, 9/9/25, at 9-11 (extraneous capitalization omitted).

As this Court has noted, "our Supreme Court, in its capacity as the exclusive rule-making authority, has provided no basis for relief where a trial court fails to abide by the time limits set by Rule 1915.4[.]" *Roy v. Ciancotta*, 2026 WL 811121, at *18 (Pa. Super. filed Mar. 24, 2026) (unpublished memorandum); *see also Schultz v. Schultz*, 350 A.3d 167, 2026 WL 2952906, at * 10-*11 (Pa. Super. filed Oct. 20, 2025) (unpublished memorandum); *Clark v. Clark*, 344 A.3d 1125, 2025 WL 2048695, at *2 (Pa. Super. filed Jul. 22, 2025) (unpublished memorandum); *Michael v. Michael*, 334 A.3d 384, 2025 WL 210548, at *13 (Pa. Super. filed Jan. 16, 2025) (unpublished memorandum); *Dear v. Dear*, 326 A.3d 433, 2024 WL

3791650, at \*6 (Pa. Super. filed Aug. 13, 2024) (unpublished memorandum); ***Heffley v. Heffley***, 318 A.3d 1290, 2024 WL 1855126 (Pa. Super. filed Apr. 29, 2024) (unpublished memorandum).

While it is certainly not unreasonable, and in fact, admirable for the trial court to undertake a thorough and comprehensive review of the record before rendering its decision, we cannot condone the trial court's failure to comply with the requirements set forth in Rule 1915.4. Nonetheless, as this Court has continuously noted, Rule 1915.4 does not provide a remedy or sanction when the trial court fails to render a timely decision. ***Roy***, 2026 WL 811121, at \*19; ***see also*** Pa.R.Civ.P. 1915.4. As with all custody and relocation matters, the best interests of the child are paramount, and Father's request that we vacate the final custody order and remand this case for a new trial does not further the Children's best interests. It is apparent from a review of the record that Mother and Father struggle with healthy communication regarding the Children and fail to act, at times, in the best interests of the Children. A child's life is precious and all too short, and parents should remember the fleeting nature of a child's youth and act, at all times, in the best interests of the child.

Final Custody Order affirmed.

Judgment Entered.

_Benjamin D. Kohler_

Benjamin D. Kohler, Esq.
Prothonotary

5/13/2026